TIM D. RUBLE AND KAREN L. RUBLE, APPELLEES, V. HAROLD
REICH, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT,
AND TIM FRANCIS AND WOODS BROS. REALTY, INC.,
THIRD-PARTY DEFENDANTS, APPELLEES.

611 N.W. 2d 844

Filed June 9, 2000.   No. S-99-596.

Timothy L. Moll, of Rembolt Ludtke & Berger, for appellant.

R. Kent Radke for appellees Tim D. Ruble and Karen L. Ruble.

Jeanelle R. Robson, of Knudsen, Berkheimer, Richardson & Endacott, for appellees Tim Francis and Woods Bros. Realty, Inc.

WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

This is a breach of contract action brought by Tim D. Ruble and Karen L. Ruble to recover damages for a breach of a real estate purchase agreement by Harold Reich. Reich denied the Rubles' claim and brought a third-party complaint against Tim Francis and Woods Bros. Realty, Inc. (Woods Bros.), alleging that if there was a breach, any damages are the responsibility of Francis and Woods Bros. The county court found that Reich had breached the contract and awarded the Rubles damages. The county court also found in favor of Francis and Woods Bros. On appeal, the district court affirmed the judgment of the county court. Reich appealed, and on our own motion, we removed the matter to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals.

## BACKGROUND

In May 1996, Reich listed his residence located at 4345 F Street in Lincoln, Nebraska, with Woods Bros. Francis, a real estate broker for Woods Bros., marketed the property.

At some point in May or June, the Rubles contacted Jackie Taylor, a mortgage loan officer with Commercial Federal Bank, and obtained preapproval for a loan, allowing the Rubles to determine the price range of a home they could afford.

On July 28, 1996, the Rubles, through their real estate agent, executed a written offer to purchase Reich's residence for $83,000. The relevant sections of the offer for purposes of this case are set forth below. Paragraph 2 of the offer stated in part:

> Buyer is to negotiate a new loan or shall assume the existing mortgage or deed of trust . . . . If processing of the loan or assumption has not been completed by the lending agency by the closing date specified elsewhere in this agreement, the time limit shall be automatically extended until the lending agency has, in the normal course of its business, advised either approval or rejection. . . . If this offer is not contingent on the sale of real estate owned by Buyer and the lender requires as a condition of granting the loan that the real estate owned by the Buyer be sold, then Seller shall have the option to declare this agreement null and void unless further written agreement between Buyer and Seller is obtained.

Paragraph 2A stated in part that the

> [b]alance shall be paid in cash, or by cashier's check at time of delivery of deed, contingent upon Buyer's ability to obtain a loan, secured by first mortgage or deed of trust, on above described Property [4345 F Street] in the amount of $62,500. The loan is to be . . . conventional.

Under "Other Provisions," the offer stated that the purchase is "contingent upon Buyers' property at 3134 NW 7th, Lincoln, closing escrow. (This property is currently under contract)." The offer also stated that closing was to occur "on August 31, 1996, or within 0 days after loan approval, whichever shall last occur." On July 29, acting through Francis, Reich accepted the Rubles' offer,  thereby creating a contract between the parties.

As stated in the purchase agreement, the loan the Rubles were applying for was a conventional loan for $62,500 from Commercial Federal Bank. The purchase price for Reich's residence was $83,000. The Rubles intended to use the money they would get from the equity in the sale of their residence at 3134 N.W. 7th Street as a downpayment on the purchase of Reich's residence.

Sometime in the middle of August, the Rubles realized they would not be able to close on August 31, 1996, because of a problem with the sale of their residence at 3134 N.W. 7th Street. On August 16, Reich received a telephone message which Francis had left on Reich's answering machine. The message indicated that the Rubles would not be able to close on August 31. After the telephone message on August 16, Reich and Francis had no contact until the middle of September when Francis left another telephone message for Reich asking whether the Rubles could move into Reich's residence prior to the upcoming closing date. Upon receiving the message, Reich called Francis and told him that he did not want to proceed with the closing. On September 26, the Rubles closed on the sale of their residence at 3134 N.W. 7th Street and were ready to close on the purchase of Reich's residence on the same day. The closing on the sale/purchase of Reich's residence did not occur.

The Rubles subsequently filed suit against Reich in county court alleging that on September 26, 1996, they were advised of their loan approval and that on that date, they were ready, willing, and able to close on the purchase of Reich's residence, and that Reich failed to close on September 26, thereby breaching the contractual obligations in the agreement. The Rubles' petition sought to recover various items of special damages. Reich denied the allegations against him in his answer, and subsequently, he filed a third-party complaint against Francis and Woods Bros. alleging that any breach of the purchase agreement and any damages resulting therefrom were caused by the acts and omissions of Francis and Woods Bros.

The county court entered an order finding that Reich had breached the purchase agreement and awarded the Rubles the following damages: $307.82 for hotel rooms; $4,650 for house rental fees; $500 for earnest money; $435 for loan and inspec-

tion fees; and $263.81 for truck rental fees. As to the third-party complaint, the county court found in favor of Francis and Woods Bros. and dismissed the third-party complaint. Reich motioned for a new trial, which was overruled. Reich timely appealed to the district court, which affirmed the judgment of the county court in all respects. The district court held:

> It is the opinion of this Court that the contract to purchase was extended automatically by the terms of the contract and that there was no "loan approval" until Commercial Federal Bank was able to fund the loan. Commercial Federal would not fund the loan until the sale of [the Rubles'] property closed enabling [the Rubles] to make the required down payment on the Commercial Federal Bank loan. Regarding the issue of damages, it appears that the [Rubles] proved their damages with as much certainty as this case permits.

Reich appealed from the district court's order.

### ASSIGNMENTS OF ERROR

Reich assigns that the district court erred in affirming the county court's (1) finding that the contract between the parties obligated Reich to close on the sale of his house on a date later than the closing date stated in the contract, (2) awarding damages because a substantial portion of the damages was not actually suffered by the Rubles, and (3) finding that Francis and Woods Bros. did not breach their fiduciary duty to Reich.

### SCOPE OF REVIEW

■ The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Ray Tucker & Sons v. GTE Directories Sales Corp.*, 253 Neb. 458, 571 N.W.2d 64 (1997); *McDonald's Corp. v. Goler*, 251 Neb. 934, 560 N.W.2d 458 (1997).

■ A suit for damages arising from breach of a contract presents an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Bachman v. Easy Parking of America*, 252 Neb. 325, 562 N.W.2d 369 (1997).

## ANALYSIS

### BREACH OF CONTRACT

Reich contends that he did not breach the contract by failing to close on September 26, 1996. The district court concluded that the Rubles did not have final "loan approval" until they closed on the sale of their residence at 3134 N.W. 7th Street on September 26 and that therefore, the August 31 closing date was automatically extended and Reich was obligated to close on September 26. Reich argues that the district court's interpretation of "loan approval" was incorrect and that the Rubles already had "loan approval" on August 31. Reich contends that because the Rubles had loan approval on August 31, the closing should have occurred on that date and that he was not obligated to close at a later date. We must determine at what point the Rubles had "loan approval" within the meaning of the agreement. We are specifically concerned with the provision in the agreement that stated "[c]losing of the sale shall be on <u>August 31</u>, 19<u>96</u>, or within <u>0</u> days after loan approval, whichever shall last occur."

Reich argues that "loan approval" relates to the completion of the loan application process, and not to the satisfaction of all preconditions to funding the loan. In other words, Reich argues that the sale of the Rubles' residence at 3134 N.W. 7th Street was not a condition of loan approval and that by August 31, 1996, the Rubles' lender had completed the processing of the Rubles' loan application and therefore, the Rubles had loan approval on August 31. It is worth noting that Reich's assertion to this court that the Rubles had loan approval on August 31 is inconsistent with a claim made by Reich in his answer to the Rubles' petition. In Reich's answer, he alleged that the Rubles failed to ensure that the processing of the loan was complete by the closing date in the agreement, thereby admitting that the Rubles did not have loan approval on August 31. Reich now contends that the processing of the loan was complete and that the Rubles had loan approval on August 31.

The Rubles contend that final loan approval did not occur until their home at 3134 N.W. 7th Street closed because it was at this point that Commercial Federal Bank was willing to fund the loan.

In interpreting a contract, we must first determine, as a matter of law, whether the contract is ambiguous. *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560 N.W.2d 424 (1997). When an appellate court is deciding questions of law, the court has an obligation to resolve the questions independent of the conclusions reached by the trial court. *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993).

A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Estate of Stine v. Chambanco, Inc., supra.* A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Id.* If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Plambeck v. Union Pacific RR. Co., supra.* In contrast, the meaning of an unambiguous contract is a question of law. *Kropp v. Grand Island Pub. Sch. Dist. No. 2*, 246 Neb. 138, 517 N.W.2d 113 (1994). When a contract is unambiguous, the intentions of the parties must be determined from the contract itself. *Id.*; *Properties Inv. Group v. Applied Communications*, 242 Neb. 464, 495 N.W.2d 483 (1993).

In this case, we are concerned with the phrase "loan approval" as used in the agreement. We determine that the phrase "loan approval" is unambiguous because it cannot be fairly interpreted in more than one way.

We view a contract as a whole in order to construe it. *Bachman v. Easy Parking of America*, 252 Neb. 325, 562 N.W.2d 369 (1997); *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993). A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *McDonald's Corp. v. Goler*, 251 Neb. 934, 560 N.W.2d 458 (1997); *C.S.B. Co. v. Isham*, 249 Neb. 66, 541 N.W.2d 392 (1996). The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable per-

sons would understand them. *McDonald's Corp. v. Goler, supra*; *Daehnke v. Nebraska Dept. of Soc. Servs.*, 251 Neb. 298, 557 N.W.2d 17 (1996).

Under the plain meaning of "loan approval," approval does not exist until all of the contingencies placed on the granting of the loan by the lending agency are met and the lending agency agrees to fund the loan. In the instant case, when we construe the contract as a whole, the Rubles did not receive loan approval until they closed on the sale of their residence at 3134 N.W. 7th Street.

In making this determination, we first consider the provision in the contract which states "[c]losing of the sale shall be on <u>August 31</u>, 19<u>96</u>, or within <u>0</u> days after loan approval, whichever shall last occur." It is clear from this provision that if the Rubles did not have loan approval by August 31, the closing date was automatically extended to the date when the Rubles obtained loan approval. Similarly, if the Rubles had obtained loan approval before August 31, closing would not have occurred until August 31 because the provision stated "whichever shall last occur."

Second, we consider the provision in paragraph 2 which states that "[i]f processing of the loan or assumption has not been completed by the lending agency by the closing date specified elsewhere in this agreement, the time limit shall be automatically extended until the lending agency has, in the normal course of its business, advised either approval or rejection." This provision demonstrates that processing continues until the bank gives formal approval or rejection of the loan. Processing of the loan is not complete when the paperwork is done but there are still contingencies that must be met before the lending agency will give approval. This provision also makes it clear that the August 31 closing date specified in the agreement is automatically extended if the buyer's lending agency has yet to advise either approval or rejection of the loan.

Third, we consider another portion of paragraph 2 which states:

> If this offer is not contingent on the sale of real estate owned by Buyer and the lender requires as a condition of granting the loan that the real estate owned by Buyer be

> sold, then Seller shall have the option to declare this agreement null and void unless further written agreement between Buyer and Seller is obtained.

This provision makes it clear that if the Rubles had not made the sale of their residence at 3134 N.W. 7th Street a condition of their offer and the Rubles' lender required as a condition of approving the loan that the Rubles' residence be sold, Reich would have had the option of declaring the agreement void. However, the Rubles did make the offer contingent on the sale of their residence at 3134 N.W. 7th Street, making it apparent that the Rubles' lending agency would require the sale of the Rubles' residence as a condition of loan approval.

When we construe the terms of the contract as a whole, it is apparent that the Rubles' loan approval was contingent on the sale of their residence at 3134 N.W. 7th Street. The Rubles had not closed on the sale of their residence on August 31, 1996, so pursuant to the agreement, the closing date on the sale/purchase of Reich's residence was automatically extended until the Rubles obtained loan approval. Reich was obligated to close after August 31.

### DAMAGES

A suit for damages arising from breach of a contract presents an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Bachman v. Easy Parking of America*, 252 Neb. 325, 562 N.W.2d 369 (1997).

The county court found Reich liable for the following damages: $307.82 for hotel rooms; $4,650 for house rental fees; $500 for earnest money; $435 for loan and inspection fees; and $263.81 for truck rental fees. Reich contests only the county court's calculation of the award for house rental fees. Reich contends that the amount of house rental fees awarded exceeds the actual damages suffered by the Rubles. The county court's calculation was based upon Karen Ruble's testimony that the Rubles had to rent a house for 6 months due to Reich's breaching the contract and had paid monthly rent of $775 for a total of $4,650.

Reich argues that the Rubles should not be awarded the full $775 a month they paid for rent because the evidence shows that

the Rubles did not suffer damages of $775 per month. Reich relies on the testimony of Karen Ruble, wherein she stated that while the Rubles were renting, they did not have to pay the monthly mortgage payments they would have had to pay if the closing on Reich's residence had occurred. Karen Ruble also testified that the Rubles' mortgage payment to Commercial Federal Bank was "going to be like $630." Of this amount, approximately $130 would have been applied toward taxes and insurance and the balance would have been applied to principal and interest. Reich contends that this evidence establishes that by renting, the Rubles avoided $630 per month in mortgage payments and that therefore, their actual damages in house rental fees were only $145 per month ($775 less $630) for 6 months for a total of $870, rather than $4,650 as awarded by the county court.

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 583 N.W.2d 320 (1998); *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 576 N.W.2d 817 (1998).

Damages, like any other element of a plaintiff's cause of action, must be pled and proved, and the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages. *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996).

The Rubles sufficiently proved that they incurred house rental payments of $775 per month for 6 months. The question becomes whether the district court erred in failing to reduce the amount awarded by the county court for rent payments because the Rubles would have had to pay mortgage payments in lieu of the rent payments if the contract had not been breached.

In measuring damages for a breach of contract, any cost or other loss that is avoided by the injured party's not having to perform is deducted from the amount of damages incurred. Restatement (Second) of Contracts § 347(c) (1981). This court has also held:

> In considering the amount of damages in breach of contract cases, the trier of fact, in applying the general rule on

damages, must also bear in mind that generally speaking the losses sustained by reason of the breach or the gains prevented are both actual and consequential damages. Of necessity this requires consideration of the concepts of mitigation on the part of the nondefaulting party and *savings realized through the breach.*

(Emphasis supplied.) *Wells Fargo Alarm Serv. v. Nox-Crete Chem.*, 229 Neb. 43, 47, 424 N.W.2d 885, 889 (1988).

Karen Ruble testified that the total monthly mortgage payment on Reich's residence would have been $630 and that of this amount, $130 would have been applied toward taxes and insurance and $500 would have been applied toward principal and interest. We cannot conclude that the $500 per month that would have been applied toward principal and interest is equivalent to $500 paid toward a rent payment such that it should be deducted from the Rubles' damages award. A $500 payment that is applied toward principal and interest has benefits, such as building equity and creating tax deductions, that a $500 rent payment does not have. The Rubles, in making rent payments instead of mortgage payments, were denied these benefits. Therefore, we conclude that $500 of the $630 a month that the Rubles would have paid in mortgage payments should not be deducted from the damages award. However, the $130 of the monthly mortgage payment that would have been applied toward taxes and insurance was savings realized through the breach and should have been deducted from the damages. Karen Ruble also testified that the first mortgage payment on Reich's residence would not have been due until a month later than their first rent payment. Therefore, the $130 should not be deducted from the first month's rent payment. The Rubles' house rental damages are modified as follows: $775 for the first month, and $645 per month ($775 less $130) for the other 5 months of rent payments, for a total of $4,000 awarded for house rental payments. The other damages awarded by the county court and affirmed by the district court remain unchanged.

## THIRD-PARTY COMPLAINT

Finally, Reich argues that the district court erred in affirming the county court's finding that Francis and Woods Bros. did not

breach their fiduciary duty to Reich. Reich alleges that Francis breached his duty by failing to disclose to Reich that he was obligated to close after August 31, 1996.

In 1994, the Legislature adopted a statutory system regulating the relationship between real estate agents or salespersons and persons who are sellers, landlords, buyers, or tenants of rights and interests in real property. See Neb. Rev. Stat. §§ 76-2401 to 76-2430 (Reissue 1996). The Legislature established that the sections of the new codified system "shall supersede the duties and responsibilities of the parties under the common law, including fiduciary responsibilities of an agent to a principal." § 76-2429. Under this statutory scheme, specifically § 76-2417(1) in pertinent part, a seller's agent owes the following duties and obligations to his principal:

(a) To perform the terms of the written agreement made with the client;

(b) To exercise reasonable skill and care for the client;

(c) To promote the interests of the client with the utmost good faith, loyalty, and fidelity, including:

(i) Seeking a price and terms which are acceptable to the client, except that the licensee shall not be obligated to seek additional offers to purchase the property while the property is subject to a contract for sale or to seek additional offers to lease the property while the property is subject to a lease or letter of intent to lease;

(ii) Presenting all written offers to and from the client in a timely manner regardless of whether the property is subject to a contract for sale or lease or a letter or intent to lease;

(iii) Disclosing in writing to the client all adverse material facts actually known by the licensee; and

(iv) Advising the client to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee;

(d) To account in a timely manner for all money and property received;

(e) To comply with all requirements of sections 76-2401 to 76-2430, the Nebraska Real Estate License Act, and any rules and regulations promulgated pursuant to such sections or act; and

(f) To comply with any applicable federal, state, and local laws, rules, regulations, and ordinances, including fair housing and civil rights statutes and regulations.

Reich has not proved that Francis breached any of these statutory duties. Reich claims that once Francis knew that the Rubles were not going to close on August 31, 1996, Francis had a duty to tell Reich that he was obligated to close after August 31. As stated above, the agreement unambiguously stated that the closing date was automatically extended if the Rubles did not have loan approval by August 31. Reich's obligation to close after August 31 was clear from the contract terms themselves. Reich had an opportunity to read the contract, and he then signed the contract. Francis did not breach a duty by failing to explain a term of the contract that was apparent from the face of the contract itself.

## CONCLUSION

The purchase agreement between the parties obligated Reich to close after the date specified in the agreement, August 31, 1996, if the Rubles did not have loan approval as of that date. The Rubles did not receive loan approval until September 26, and Reich's failure to close on this date was a breach of the contract. The Rubles are entitled to $775 for the first month, and $645 per month ($775 less $130) for the other 5 months of rent payments, for a total of $4,000 awarded for house rental payments. The other damages awarded by the county court and affirmed by the district court remain unchanged. The district court's decision upholding the county court's dismissal of the third-party complaint against Francis and Woods Bros. is affirmed.

AFFIRMED AS MODIFIED.

HENDRY, C.J., and STEPHAN, J., not participating.